## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

JAY BESSINGER,                                  )
                                                )
      Plaintiff,                            )
                                                )
v.                                              )
                                                )    Case No. 23-cv-00452-SH
CIMAREX ENERGY CO. and COTERRA       )
ENERGY, INC.,                                   )
                                                )
      Defendants.                           )

### OPINION AND ORDER

Before the Court is Defendants' motion to dismiss Plaintiff's *First Amended Petition*.[1] While the petition asserts only state-law claims, Defendants argue these claims are completely preempted by ERISA because they relate to an employee welfare benefit plan. The Court agrees and finds Plaintiff's state-law claims should be dismissed. The Court, however, will allow Plaintiff to amend his complaint to restate his ERISA claims.

### PROCEDURAL BACKGROUND

Plaintiff Jay Bessinger ("Bessinger") commenced this suit in state court on September 15, 2023. (ECF No. 2-2.) Originally, Bessinger asserted claims both under state law and the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. § 1101 *et seq.* (*Id.* at 6 (citing ERISA § 502(A)(1), 29 U.S.C. § 1132(a)(1)).[2]

On October 3, 2023, Bessinger amended his claims as a matter of right and filed the at-issue petition.[3] (ECF No. 2-6.) This petition was substantively identical to the

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a). (ECF No. 15 at 4.)

[2] Unless otherwise noted, citations to page numbers refer to the Court-provided header.

[3] Under Oklahoma law, a party may amend his pleading once as a matter of course before a responsive pleading is served. Okla. Stat. tit. 12, § 2015(A).

original petition, except that it omitted the ERISA claim and a single factual allegation (ECF No. 2-2 ¶ 25).  (*Compare* ECF No. 2-2 *with* ECF No. 2-6.)  As a result, Bessinger currently has pending state-law claims for breach of contract and violation of the Oklahoma Protection of Labor Act, Okla. Stat. tit. 40, § 165.1 *et seq.*  (ECF No. 2-6 ¶¶ 26-41.)  Both of Bessinger's claims relate to benefits he alleges are due him under the Cimarex Energy Co. ("Cimarex") Change in Control Severance Plan (the "Severance Plan").  (*See id.* ¶¶ 27-31, 37; *see also* ECF No. 10-1.)

On October 19, Defendants removed the lawsuit to this Court on the basis of federal question and diversity jurisdiction.  (ECF No. 2.)  A week later, they filed the current motion to dismiss.  (ECF No. 10.)

## FACTUAL BACKGROUND

The Court derives the factual allegations in this order from the amended petition and the Severance Plan.[4]

Bessinger was employed by Cimarex as an accountant starting February 2015.  (ECF No. 2-6 ¶ 7.)  During his employment, Cimarex had in place the Severance Plan, which provided separation benefits to plan participants in the event a participant was terminated following a change in control.  (*Id.* ¶¶ 8, 13; *see also* ECF No. 10-1 (the Severance Plan).)  The relevant terms of the Severance Plan are outlined below.

---

[4] When ruling on a Rule 12(b)(6) motion to dismiss, "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).  The Court finds the Severance Plan, which was referenced in Plaintiff's amended petition, to be central to his claims.  Plaintiff has not disputed the authenticity of the plan document provided by Defendants.

**The Severance Plan**

Effective April 1, 2005, the Severance Plan is intended to provide benefits to certain participants in the event they are terminated following any change in control.  (ECF No. 10-1 at 2, as amended and restated at 33.)  Each employee actively employed by Cimarex on the date of a "Change in Control" is deemed a "Participant" in the plan.  (*Id.* at 38, § 3.1.)  The plan automatically terminates two years after the Change in Control, but any Participants who become entitled to payments prior to that date continue to receive payments afterwards.  (*Id.* at 44, § 7.1.)

To be entitled to separation benefits, a Participant's employment must terminate under certain circumstances after the Change in Control.  (*Id.* at 38-39, §§ 4.1, 4.2(a).)  When employment is terminated by the employer, it must be for reasons other than "Cause," death, or disability.[5]  (*Id.* at 38, § 4.1(a).)  When terminated by the Participant, it must be for "Good Reason" and within 120 days of the Participant's knowledge of the occurrence of that Good Reason.  (*Id.* § 4.1(b).)  "Good Reason" is generally defined as including a nonconsensual reduction in the Participant's annual base salary, a material reduction in the Participant's annual incentive compensation opportunity, the company requiring the participant to relocate more than 50 miles from his previous office location, or the company's failure to provide generally comparable benefits following the Change in Control.  (*Id.* at 37, art. II(p).)

---

[5] "Cause" means "(i) the willful and continued failure of the Participant to perform substantially the Participant's duties with the Company . . ., (ii) the willful engaging by the Participant in misconduct which is materially and demonstrably injurious to the Company . . ., or (iii) a business crime or felony involving moral turpitude of which the Participant is convicted or pleads guilty."  (*Id.* at 34-35, art. II(e).)

The potential separation benefits are twofold—cash payments and continued fringe benefits.  (*Id.* at 39, § 4.2(a)-(c); *id.* at 51, § 4.2(b)(ii).[6])  The cash payments consist of a portion of the Participant's average incentive bonus, paid out in a lump sum (*id.* at 39, § 4.2(b)(i), (d)), as well as a multiple of the Participant's annual average compensation, paid out in monthly installments (*id.* at 51, § 4.2(b)(ii) & at 30-40, § 4.2(d)).  Depending on the Participant's years of service, the monthly installments could be paid for as long as 24 months.  (*Id.* at 51, § 4.2(b)(ii).)  During those two years, the Participant would also be provided "medical, dental, vision, disability and life insurance benefits as if the Participant's employment had not been terminated . . . ."  (*Id.* at 39, § 4.2(c).)  "To the extent any benefits . . . cannot be provided pursuant to the appropriate plan or program maintained for Employees, the Company shall provide such benefits outside such plan or program at no additional cost . . . to the Participant."  (*Id.*)

Cimarex is the named fiduciary of the plan and administers its terms through the company's vice president of human resources, or the "Plan Administrator."  (*Id.* at 45, § 8.4.)  The Plan Administrator has "full and complete discretionary authority to administer, to construe, and to interpret the Plan, to decide all questions of eligibility, to determine the amount, manner and time of payment, and to make all other determinations deemed necessary or advisable for the Plan."  (*Id.* § 8.5(b).)  The plan sets out detailed procedures for consideration of claims requests and subsequent appeals by the Plan Administrator and an "Appeals Committee."  (*Id.* at 45-46, § 8.5(a)-(f).)  If a claims request is denied, the Plan Administrator must notify the claimant in writing of the denial and its

---

[6] Subsection 4.2(b)(ii) was replaced by amendment in May 2021.  (ECF No. 10-1 at 51-52.)

reasoning; explain the review procedure; and state the claimant's right to bring a civil action under ERISA § 502(a).  (*Id.* at 45, § 8.5(c).)

The plan is unfunded, and all payments made pursuant to the Severance Plan are drawn from the general funds of the company.  (*Id.* at 47, § 8.7.)

### The Change in Control and Bessinger's Termination

In May 2021, Cimarex announced a Change in Control due to an all-stock merger with Cabot Oil & Gas Corporation, forming Defendant Coterra Energy, Inc.  (ECF No. 2-6 ¶¶ 9, 14.)  The headquarters of the new company would be in Houston, Texas, and the merger would close on October 1, 2021.  (*Id.* ¶¶ 14-15.)

In September 2021, Bessinger received an email from Human Resources inquiring as to whether members of his department were willing to relocate to Houston.  (*Id.* ¶ 10.) Bessinger responded that he was not, and he spoke to his managers numerous times between December 2021 and February 2022 regarding "his plan to transition to a different company and receive the severance benefits to which he was entitled under the Plan."  (*Id.* ¶¶ 11-12.)  Bessinger alleges he was entitled to benefits, as he was a plan Participant who terminated his employment for Good Reason within 120 days after he had knowledge of the Good Reason.  (*Id.* ¶¶ 16-17; *see also* ECF No. 10-1 at 38, § 4.1(b).)  Per Plaintiff, his "Good Reason" was that Cimarex relocated his department to Houston, which was more than 50 miles from his previous office in Tulsa.  (*Id.* ¶ 16; *see also* ECF No. 10-1 at 37, art. II(p).)  Bessinger's supervisors, however, denied him benefits under the Severance Plan, as did the Plan Administrator.  (*Id.* ¶¶ 18-19, 21.)   Bessinger appealed, but Cimarex affirmed the denial.  (*Id.* ¶ 22.)

Bessinger claims Defendants "unreasonably and wrongfully denied benefits under the" the Severance Plan, resulting in the "loss of severance pay and benefits, attendant financial hardship and pain and suffering." (*Id.* ¶¶ 24-25.)

## THE CURRENT MOTION

Defendants now move to dismiss Plaintiff's amended petition under Rule 12(b)(6), arguing Plaintiff's state-law claims are preempted because they are based on an entitle-ment to benefits purportedly owed under a group employee welfare benefit plan governed by ERISA. (ECF No. 10 at 1-2.) Plaintiff, however, argues the Severance Plan does not qualify as an ERISA-covered plan because the plan "did not require any ongoing admin-istration" or otherwise require the employer to assume reasonability to process and pay benefits on a regular basis. (ECF No. 17 at 1-2.) For reasons explained below, the Court finds the plan to be covered by ERISA.

## ANALYSIS

### I.    Standard of Review

Under Rule 12, a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive such a motion, "a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts resolve all reasonable factual inferences in the plaintiff's favor. *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013). After accepting Plaintiff's factual allegations as true, the Court may then turn to the scope of ERISA preemption, which is a "question of law." *Kidneigh v. UNUM Life Ins. Co. of Am.*, 345 F.3d 1182, 1184 (10th Cir. 2003).

6

## II.     The Severance Plan's Status Under ERISA

The essential dispute between the parties is whether the Severance Plan is an "employee welfare benefit plan" under ERISA.  As such, the Court starts its analysis there.

### A.     ERISA—Generally

"ERISA was passed by Congress in 1974 to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits." *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989).  While the "precise coverage of ERISA is not clearly set forth in the Act," it generally covers "employee benefit plans," which include the "employee welfare benefit plan."  *Id.* at 113.  The Act applies to <u>plans</u>, rather than employee <u>benefits</u> generally.  *See, e.g.*, 29 U.S.C. § 1001(b) ("the policy of this chapter [is] to protect interstate commerce and the interests of participants in employee benefit plans"); *id.* § 1132(a)(1)(B) (a civil action may be brought by a participant "to recover benefits due to him under the terms of his plan"); *id.* § 1144(a) ("the provisions of this subchapter . . . shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan"); *see also Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 16 (1987) ("ERISA is concerned with regulating benefit 'plans'").

An "employee welfare benefit plan" includes "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . benefits in the event of sickness, accident, disability, death or unemployment . . . ."  29 U.S.C. § 1002(1)(A).  "Five elements thus make up an ERISA welfare benefit plan: (1) a 'plan, fund, or program'; (2) established or maintained; (3) by an employer; (4) for the purpose of providing ERISA-type benefits; (5) to participants or their beneficiaries." *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1178 (10th Cir. 1997).

It is the first element that Plaintiff argues is absent from the Severance Plan. Plaintiff believes no ERISA plan exists because the Severance Plan "did not require any ongoing administration" to satisfy Cimarex's obligations.  (ECF No. 17 at 2.)

### B.  Plan, Fund, or Program

#### 1.  Generally

"A plan, fund, or program exists if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and the procedures for receiving benefits." *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 464 (10th Cir. 1997) (internal quotations omitted).  "[I]n order to fit within ERISA, the plan must implicate benefits 'whose provision by nature requires an ongoing administrative program to meet the employer's obligation.'" *Siemon*, 117 F.3d at 1178 (quoting *Fort Halifax*, 482 U.S. at 11).

#### 2.  The Severance Plan is a Plan, Fund, or Program under ERISA

Plaintiff does not dispute that—apart from the issue of ongoing administration—the Severance Plan would qualify as a plan under ERISA.  The Court agrees.  From the surrounding circumstances, a reasonable person can ascertain the intended benefits (*see* ECF No. 10-1 at 39-40, § 4.2 & at 51, § 4.2(b)(ii)); the class of beneficiaries (*see id.* at 38, § 3.1); the source of financing (*see id.* at 47, § 8.7); and the procedure for receiving benefits (*see id.* at 45-47, § 8.5).  Therefore, the Court—like the parties—will focus solely on whether the Severance Plan involves ongoing administration.

> [A]ppellate courts have identified a variety of factors to be taken into account in determining whether a severance or retirement benefits package qualifies as a "plan" for the purposes of ERISA preemption, including: (1) whether defendant is to pay benefits as a one time, lump sum payment or as periodic payments; (2) whether the agreement permits the exercise of discretion by the employer in the determination and allocation of severance benefits, and, if so, how much; (3) whether the employer would be required

to analyze separately the circumstances of each employee's termination in light of standards set by defendant; (4) and the certainty of an employer's obligation to pay severance benefits to an employee . . . . Courts have relied upon one or a combination of these factors, but have identified none as dispositive.

*Thompson v. Bama Cos.*, No. 05-CV-0271-CVE-FHM, 2006 WL 717477, at *5 (N.D. Okla. Mar. 20, 2006) (citations omitted) (collecting cases from the Fifth, First, Eighth, and Second Circuits). The Tenth Circuit has emphasized that the presence of a lump-sum benefit is not dispositive; instead, the Court looks to whether "only a one-time event would trigger the payment." *Siemon*, 117 F.3d at 1178-79 (noting *Fort Halifax's* distinction between a one-time severance payment for all employees triggered by a plant closure and a one-time benefit payment triggered by death). The Tenth Circuit has further found that when a company "actually has in place an administrative regime to evaluate such [benefit] requests," it is "strong evidence that an ongoing scheme is necessary to process requests for" those benefits. *Id.* at 1179. Looking to *Siemon*, another panel of the Tenth Circuit has said that "the hallmarks of an ERISA plan are whether the plan pays benefits triggered by several events, as opposed to a one-time event, and whether it requires regular periodic payments." *Lettes v. Kinam Gold Inc.*, 3 F. App'x 783, 786 (10th Cir. 2001) (unpublished).[7] The Court will address these various factors in turn.

### a)      Triggering Events and Payment of Benefits

Looking to the "hallmark" described in *Lettes*, the Court finds this factor weighs in favor of finding the Severance Plan to be an ERISA plan, as it is triggered by several events and involves both one-time and periodic payments.

---

[7] Unpublished decisions are not precedential but may be cited for their persuasive value. 10th Cir. R. 32.1(A).

### (1)    The Severance Plan is Triggered by Several Events

First, the Court finds that eligibility for benefits under the Severance Plan is triggered by several events, rather than a single, one-time event.  To be sure, no one could seek benefits under the Severance Plan were there not a "Change in Control."  (*See, e.g.*, ECF No. 10-1 at 38, § 3.1 (to be a Participant, an employee must be actively employed by the company on the date of the Change in Control).)  But this one event does not entitle Participants to benefits under the Plan.  Instead, there must be another triggering event that varies from person-to-person and could occur at any time during the two years following the Change in Control.  This subsequent triggering event could be that the company chose to terminate an employee for a reason other than Cause, death, or disability.  (*Id.* § 4.1(a).)  Or, it could be the company reduced the Participant's base salary and did not restore it, reduced the Participant's annual incentive compensation opportunities, required the Participant to relocate their principal place of business to an office over 50 miles away, or failed to provide generally comparable benefits—and, even then, only if the Participant requested severance benefits within 120 days of one of these events.  (*Id.* at 37, art. II(p) & 38, § 4.1.)  This is a far cry from the one-time closure of a plant that triggered a single, statutory severance payment found <u>not</u> to be preempted in *Fort Halifax*.  *See Siemon*, 117 F.3d at 1178.  The Severance Plan here creates "a continuing obligation to process and consider applications" for benefits, which would be made on a regular basis.  *Id.* at 1179.[8]

---

[8] *Siemon* found the plan before it would be an "ongoing administrative program" under *Fort Halifax*, but decided the plan did not qualify under ERISA because a reasonable person could not ascertain the intended benefits.  *Id.* at 1179.  In this case, as noted above, the benefits are ascertainable.

The Court recognizes that the panel in *Lettes* found the golden parachute plan before it to be "contingent on a one-time event that might never happen, and expressly limited to a narrow time period." 3 F. App'x at 788.  The undersigned also recognizes that the *Lettes* court made this finding while considering a plan that provided nine key employees an extra payment upon their "separation from service after a 'change in control,'" where "separation from service" included termination without cause or quitting for a good reason.  *Id.* at 785; *see also id.* at 785 n.2 (defining good reason as including a material reduction in compensation, benefits, titles, or duties, or moving the employee's principal place of employment more than 35 miles from the employee's office or residence).[9]  To the extent, however, Plaintiff argues the reasoning of *Lettes* requires the Court to find a "one-time event" in <u>every</u> severance plan that provides benefits after some sort of termination of employment following a change in control, the Court finds such reasoning unpersuasive.  This is partially because the Court in *Lettes* was applying a far different kind of plan.  The "golden parachute plan" in *Lettes* was created in anticipation of a particular merger, affected only nine key employees, and appeared to anticipate that the fate of all nine employees would be decided almost simultaneously.  *Id.* at 785 ("Upon merger . . ., golden parachute benefits were automatically paid without separate request or action . . . to seven of the nine 'key employees'"; the eighth employee had left before the change in control; and the company believed the ninth—Mr. Lettes—did not qualify for payment)).  It might be reasonable in the circumstances of *Lettes* to find the change in control to be a single, triggering event; it is not reasonable to read the far broader Cimarex Severance

_____

[9] This so-called "golden parachute" payment was in addition to the benefit due ordinary employees under the company's general severance plan.  *Id.* at 785.

plan—with its two-year period and applicability to all then-active employees—the same way.

Admittedly, other courts have found a plan-preclusive, one-time event in lump-sum golden parachute or severance plans for key employees.  *See, e.g.*, *Fontenot v. NL Indus., Inc.*, 953 F.2d 960, 961-63 (5th Cir. 1992) (lump sum payment if executive terminated for any reason within two years of change in control); *Johnson v. Labs, Inc.*, No. 16-CV-00718-MEH, 2016 WL 9735765, at *7 (D. Colo. Sept. 8, 2016) (noting it was "undisputed" in the case before it that the Executive Severance Agreement provided for "'a single lump sum payment' in the event of a single occurrence: separation from  employment").  However, those cases have focused less on the triggering event and much more on the one-time nature of the payments that require no administrative scheme and no responsibility to pay benefits on a regular basis.  *See Fontenot*, 953 F.2d at 962-63; *Johnson*, 2016 WL 9735765, at *7.  To the extent they can be read otherwise, the Court does not find them persuasive.

Instead, the Court finds persuasive the reasoning in other cases that involve a larger number of employees who may demand severance benefits over a period of time— whether it be ongoing or during a set duration of years.  *See, e.g.*, *Gomez v. Ericsson, Inc.*, 828 F.3d 367, 372 (5th Cir. 2016) (finding standard severance agreements offered to thousands of employees were "a far cry from 'single event' plans" because "[e]ven if a small percentage of covered employees qualified for severance at some point . . . that would result in hundreds of different events that the Plans have to administer"); *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 631 (7th Cir. 2001) (finding change-in-control severance plan was governed by ERISA  because, in part, "[t]he covered employees had a one-year period in which they could make a demand for severance benefits, which

required [the employer] to budget for the possibility of making multiple payments throughout the course of that year").

In any case, the nature of the "triggering event"—whether it is the Change in Control or the severance—is just one of the factors that play into the Court's determination as to whether the Severance Plan requires ongoing administration. As noted below, other factors also weigh in favor of finding it to be a "plan" under ERISA.

### (2)   The Severance Plan Involves Multiple Payments over Time

Unlike the one-time, lump sum payment at issue in *Fort Halifax* and other cases, the benefits here are more expansive. As noted above, benefits under the Severance Plan are triggered at various times for different Participants over the two-year period following the Change in Control. (ECF No. 10-1 at 37-38, art. II(p) & § 4.1.) They consist of both a lump-sum bonus payment and monthly compensation for up to two years after the Participant's right to benefits is triggered—meaning Cimarex would potentially have monthly obligations over a nearly four-year period. (*Id.* at 39, § 4.2(a), (b) & (d); *id.* at 51, § 4.2(b)(ii).)

During the two years in which monthly compensation is paid, Cimarex is also obligated to provide medical, dental, vision, disability, and life insurance benefits to the Participant and their dependents, and to provide such benefits outside any existing plan or program at no additional cost if they cannot be provided pursuant to the current appropriate plan. (*Id.* at 39, § 4.2(c).) This is much more than simple "installment" payments of a pre-determined amount to an employee. *See, e.g.*, *Thompson*, 2006 WL 717477, at *7 (citing *Herring v. Oak Park Bank*, 963 F. Supp. 1558, 1566 (D. Kan. 1997)). This also stands in stark contrast to the benefits in *Fort Halifax*, where "[t]he employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic

demands on its assets that create a need for financial coordination and control." *Fort Halifax*, 482 U.S. at 12; *see also Lettes*, 3 F. App'x at 788 (faulting lower court for not "examining whether the benefits also necessitated an ongoing scheme to coordinate and control monies that would fund the regular distribution of payments"). The monthly payments contemplated by the Severance Plan—along with the provision of medical, dental, vision, disability, and life insurance benefits to participants and their dependents over a potential four-year period—is enough to indicate that an ongoing administrative scheme was necessary.

### b)        Discretion of the Plan Administrator

Next, the Court considers the amount of discretion the Plan Administrator has in making benefit determinations and allocations. *Thompson*, 2006 WL 717477, at *5; *Lettes*, 3 F. App'x at 788 ("[w]hether a plan administrator has discretion in determining eligibility for benefits may be one factor to be considered in deciding whether an administrative scheme for processing claims is necessary"). Here, the "Plan Administrator [has] full and complete discretionary authority to administer, to construe, and to interpret the Plan, to decide all questions of eligibility, to determine the amount, manner and time of payment, and to make all other determinations deemed necessary or advisable for the Plan." (ECF No. 10-1 at 45, § 8.5(b).)

But much like *Lettes*, "[a]lthough the plan administrator had discretion to interpret ambiguities in the plan, the language setting out eligibility requirements was explicit and absolute, thus significantly limiting the administrator's discretion." 3 F. App'x at 787

n.3.  (*See, e.g.*, ECF No. 10-1 at 34-35, art. II(e) (defining "Cause");[10] *id.* at 37, art. II(p)

(defining "Good Reason");[11] *id.* at 38, § 4.1 (defining terminations that give rise to sepa-

ration benefits); *id.* at 39-40 and 51, § 4.2 (defining when and how such benefits are to be

paid).)  Thus, while the Plan Administrator has substantial discretion—and while other

courts have certainly found that such discretion weighs toward finding a severance agree-

ment to be a "plan" under ERISA, *Gomez*, 828 F.3d at 372—the mere fact that this discre-

tion exists does not weigh heavily toward finding the Severance Plan to be an ERISA plan.

### c)    Analysis of Each Employee's Termination

Next, the Court looks to whether the Severance Plan requires the administrator to

separately analyze the circumstances of each employee's termination in light of plan

standards.  "[A]n employer's need to create an administrative system may arise where the

employer, to determine the employees' eligibility for and level of benefits, must analyze

each employee's particular circumstances in light of the appropriate criteria." *Kulinski v.*

*Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 257 (8th Cir. 1994) *cited in Thompson*, 2006

WL 717477, at *5; *see also Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 76 (2d

Cir. 1996) (finding the severance plan governed by ERISA, in part, because it "necessi-

tated both managerial discretion and a separate analysis of each employee in light of

certain criteria.").

---

[10] While the term "Cause" is defined, the administrator still must exercise some discretion
in deciding issues for which there is no mechanical answer, such as whether a Partici-
pant's failure "to perform substantially" her duties was "willful and continued" or whether
the Participant "willfully" engaged in "misconduct which is materially and demonstrably
injurious" to the company.  (ECF No. 10-1 at 34-35, art. II(e) (further defining "willful").)

[11] Similarly, while "Good Reason" is defined, it still requires the determination of non-
mechanical issues, such as whether there is a "material reduction in the Participant's
annual incentive compensation opportunity" or whether the company failed "to provide
generally comparable benefits" following a Change in Control.  (ECF No. 10-1 at 37, art.
II(p).)

Here, the Severance Plan requires exactly this sort of individual analysis.  The administrator must consider the circumstances surrounding each Participant's termination (such as whether they were terminated for "Cause" or left for "Good Reason"), then calculate each Participant's benefits based on the terms and length of their employment and compensation.  Thus, while the mere fact of discretion does not itself speak strongly toward the existence of a plan, the individual analysis required to determine eligibility of each and every employee evidences the sort of periodic demands on an employer that necessitate an administrative scheme.  This is particularly true where the Severance Plan covers all employees who were "actively employed" at the time of the Change in Control and not some small, exclusive group.  (ECF No. 10-1 at 38, § 3.1.)  *Cf. Lettes*, 3 F. App'x at 785 (plan covered nine "key employees");[12] *Thompson*, 2006 WL 717477, at *7 (plaintiff was "only employee" subject to the severance agreement).  As such, this factor weighs in favor of finding an ERISA plan.

### d)      An Administrative Regime in Place

Plaintiff's allegations further show that Cimarex had an active administrative regime in place.  After receiving an inquiry from human resources about his willingness to relocate, Bessinger communicated with human resources and his managers.  (ECF No. 2-6 ¶¶ 10-12.)  Bessinger then requested benefits directly to the Plan Administrator, was given a reason for his denial, appealed that denial under the Severance Plan, and received notification that his denial of benefits of was affirmed.  (*Id.* ¶¶ 21-22.) As the Tenth Circuit has found, "the fact that [the employer] actually has in place an administrative regime to

---

[12] Further, unlike in *Lettes*, where the plan was put in place a year before the merger, the plan at issue here had been in place—and amended and kept current—for roughly 17 years.  (ECF No. 10-1.)

evaluate [benefit] requests is strong evidence that an ongoing scheme is necessary to process requests for" benefits under the plan.  *Siemon*, 117 F.3d at 1179; *see also Gomez*, 828 F.3d at 372 ("Even for plans that result in only a lump-sum payment, [an ongoing] administrative scheme can be found in a number of other features," such as "the establishment of procedures for handling claims and appeals.").  Therefore, this factor also speaks to the presence of an ongoing administrative scheme.

### e)      Certainty of Obligation to Pay Benefits

Finally, the Court considers the certainty of Cimarex's obligation to pay severance benefits to its employees.  "In *Fort Halifax*, the Court stressed the contingent nature of the obligation the Maine statute imposed: the payment requirement would arise only if the employer closed the plant."  *James v. Fleet/Norstar Fin. Grp., Inc.*, 992 F.2d 463, 467 (2d Cir. 1993), *quoted in Thompson*, 2006 WL 717477, at *5.  Here, payment of benefits under the Severance Plan is doubly contingent—requiring both a change in control and a subsequent termination of employment.  There is no certainty that speaks to a "plan" under ERISA.  This factor weighs against finding an ERISA plan.

Briefly, the Court returns to the overall review of the Severance Plan and whether it requires ongoing administration.  As previously noted, no one factor is dispositive.  *Thompson*, 2006 WL 717477, at *5.  Here, the nature of the Severance Plan as a whole indicates the presence of an ongoing administrative scheme and particularly includes what a Tenth Circuit panel has called the "hallmark" of an ERISA plan: paying "benefits triggered by several events, as opposed to a one-time event" and requiring "regular periodic payments."  *Lettes*, 3 F. App'x at 786.  The Court, therefore, finds the Severance Plan to be a "plan, fund, or program" under ERISA.

### C.      Other Elements of an ERISA Welfare Benefit Plan

As mentioned above, the "plan, fund, or program" issue so disputed by the parties is but one of the five elements that make up an ERISA welfare benefit plan.  The others are whether the plan is "(2) established or maintained; (3) by an employer; (4) for the purpose of providing ERISA-type benefits; (5) to participants or their beneficiaries." *Siemon*, 117 F.3d at 1178.  Plaintiff does not dispute that these elements are met (ECF No. 17), and the Court finds they are satisfied.

The Severance Plan was established and maintained by Cimarex.  (*See, e.g.*, ECF No. 10-1 at 33.)  Cimarex was an employer.  (ECF No. 2-6 ¶ 7.)  The Severance Plan's purpose was to provide separation benefits upon termination of employment, which are ERISA-type benefits.  (ECF No. 10-1 at 38, § 4.1.)  *See* 29 U.S.C. § 1002(1) (noting an employee welfare benefit plan includes a plan to provide benefits in the event of unemployment); *see also Morash*, 490 U.S. at 116 ("plans to pay employees severance benefits, which are payable *only* upon termination of employment, are employee welfare benefit plans within the meaning of the Act").  And finally, the benefits are paid to Participants and their beneficiaries.  (ECF No. 10-1 at 39, § 4.2(b)-(d).)

The Severance Plan is, therefore, an ERISA welfare benefit plan.

## III.   Preemption of Plaintiff's Claims

The Court next determines whether Plaintiff's claims are preempted by ERISA.

### A.      ERISA Preemption—Generally

ERISA provides a civil claim for enforcement of rights under ERISA-governed plans.  *See* 29 U.S.C. § 1132(a).  It also "contains an express preemption provision that provides that ERISA 'shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by ERISA."  *Felix v. Lucent Techs.,*

*Inc.*, 387 F.3d 1146, 1153 (10th Cir. 2004) (quoting 29 U.S.C. § 1144(a)).  The Supreme Court has "observed repeatedly that this broadly worded provision is 'clearly expansive,'" *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 146 (2001), and "conspicuous for its breadth," *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990) (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990).  "A law relates to an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* at 139 (internal quotations omitted).  Thus, "[u]nder this broad common-sense meaning, a state law may relate to a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect."  *Id.* (internal quotations omitted).

"The Supreme Court has . . . held that ERISA preempts common law claims, as well as claims arising under state statutory schemes governing employee benefit plans." *Huff v. Metro. Life Ins. Co.*, No. 21-CV-0284-CVE, 2021 WL 4952501, at *3 (N.D. Okla. Oct. 25, 2021) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47-48 (1987)).  This includes common law contract claims.  *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 62 (1987); *see also Settles v. Golden Rule Ins. Co.*, 927 F.2d 505, 509 (10th Cir. 1991) ("common law . . . breach of contract claims are preempted by ERISA if the factual basis of the cause of action involves an employee benefit plan").

Moreover, "if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B) [29 U.S.C. § 1132(a)(1)(B)], and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted . . . ." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004).

### B.      Plaintiff's Claims are Preempted under ERISA

In this case, Plaintiff's common law and statutory claims are preempted.  Regarding his breach of contract claim, Plaintiff alleges "Defendant has breached its contract with Plaintiff by failing to pay Plaintiff the benefits owed under the Plan," which "constitutes a breach of contract of said Change in Control Benefit Plan." (ECF No. 2-6 at ¶ 31.) As the factual basis of Plaintiff's claim relies solely on the ERISA-governed Severance Plan, the cause of action "relates" to the plan under 29 U.S.C. § 1144(a) and is defensively preempted.  Similarly, because Plaintiff could have brought this claim under 29 U.S.C. § 1132(a) *and* because there was no other legal duty implicated by Defendants' actions other than those arising from the Severance Plan, his breach of contract claim is federal in character and completely preempted.

The same is true of Plaintiff's statutory claim.  Plaintiff relies on Oklahoma's Protection of Labor Act, which provides that when "an employee's employment terminates, the employer shall pay the employee's wages in full" and provides for liquidated damages in the event the employer fails to pay.  Okla. Stat. tit. 40, § 165.3(A)-(B).  The "wages" Plaintiff claims to be owed are benefits under the Severance Plan.  (ECF No. 2-6 ¶¶ 37-39.)  Again, Plaintiff relies exclusively on the Severance Plan to bring this claim, and the claim is, therefore, preempted.

### IV.    Plaintiff May File an Amended Complaint

Finally, the Court considers Plaintiff's alternative request to amend his petition to state an ERISA claim.  (ECF No. 17 at 5.)

Where, as here, a party requests the Court's leave to amend, such leave should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This is because "[t]he purpose of the Rule is to provide litigants the maximum opportunity for each claim to be

decided on its merits rather than on procedural niceties." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (internal quotations omitted).  Denial of leave to amend may be appropriate in instances of undue delay, bad faith or dilatory motive, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or futility of amendment.  *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Granting leave to amend "is within the discretion of the trial court."  *Id.* (internal quotations omitted).

Here, Defendants argue Plaintiff's undue delay and lack of timeliness should result in a denial of amendment.  (ECF No. 10 at 9-10.)  Defendants cite cases where the delay often covered a number of years.  *See, e.g.*, *Cuenca v. Univ. of Kansas*, 205 F. Supp. 2d 1226, 1230-31 (D. Kan. 2002) (over three years after filing the case); *Hayes v. Whitman*, 264 F.3d 1017, 1026 (10th Cir. 2001) (more than two years after the complaint); *Eckert v. Dougherty*, 658 F. App'x 401, 410-11 (10th Cir. 2016) (unpublished) (almost 18 months after original complaint and four months after dismissal with leave to amend).

In contrast to the above cases, Plaintiff's request to amend did not come after years of delay.  Plaintiff filed his original petition on September 15, 2023 (ECF No. 2-2) and, as master of his complaint, attempted to avoid asserting a federal claim by amending 18 days later (ECF No. 2-6).  Defendants then appeared in the case and almost immediately moved to dismiss.  (ECF No. 10.)  In that motion, filed a mere 41 days after Plaintiff brought suit, Defendants argue that it is "untimely" for Plaintiff to amend.  This argument is a non-starter.  The only delay has been in the undersigned's ruling on the motion to dismiss.  Plaintiff will be freely given the leave he requests.

**CONCLUSION**

IT IS THEREFORE ORDERED that *Defendants' Motion to Dismiss Plaintiff's First Amended Petition* (ECF No. 10) is GRANTED.  Plaintiff's claims are dismissed without prejudice to amending to add an ERISA claim.  Plaintiff shall file his amended complaint by August 5, 2024, or this case will be dismissed with prejudice.

ORDERED this 22nd day of July, 2024.

_____
SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT