IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JAY BESSINGER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 23-cv-00452-SH |
| CIMAREX ENERGY CO. and COTERRA ENERGY, INC., | ) ) ) |
| Defendants. | ) ) |

**OPINION AND ORDER**

Plaintiff Jay Bessinger ("Bessinger") seeks judicial review of his former employer's denial of severance benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101 et seq.[1] Plaintiff has failed to show the benefit determination was an abuse of discretion. The Court, therefore, affirms Defendants' decision and denies Plaintiff's request for an award of benefits.

**I.    The Administrative Record**

The following facts are derived from the administrative record:

**A.    The Severance Plan**

Bessinger was employed by Cimarex Energy Co. ("Cimarex") as a lead accountant. (AR 34.[2]) During his employment, Cimarex maintained a Change in Control Severance Plan (the "Plan") that provided separation benefits to certain employees following a change in control. (AR 131–53.) Broadly, the Plan provided that

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a). (Dkt. No. 15 at 4.)

[2] References to "AR" refer to the parties' agreed-upon administrative record (Dkt. No. 32).

> A Participant[3] shall be entitled to Separation Benefits . . . if, at any time following a Change in Control and prior to the second anniversary of the Change in Control, the Participant's employment is terminated . . . (a) by the Participant's Employer for any reason other than Cause, death, or Disability or (b) by the Participant for Good Reason within 120 days after the Participant has knowledge of the occurrence of a Good Reason.

(AR 136 § 4.1.) As relevant here, "Good Reason" includes "the Company[4] or the Employer requiring the Participant to relocate his or her principal place of business to another metropolitan area which is more than 50 miles from his or her previous office location." (AR 135 art. II(p).)

Cimarex is the named fiduciary of the Plan and administers its terms through its Vice President of Human Resources, or the "Plan Administrator." (AR 143 § 8.4.) The Plan Administrator has "full and complete discretionary authority to administer, to construe, and to interpret the Plan, to decide all questions of eligibility, to determine the amount, manner and time of payment, and to make all other determinations deemed necessary or advisable for the Plan." (*Id.* § 8.5(b).) The Plan sets out detailed procedures for consideration of claims requests and subsequent appeals by the Plan Administrator and an "Appeals Committee." (AR 143–44 § 8.5(a)–(f).) The Appeals Committee consists of the Company's Chief Executive Officer, Chief Financial Officer, and Assistant Treasurer. (AR 143 § 8.4.)

The Plan is unfunded, and all payments made pursuant to it are drawn from the general funds of the Company. (AR 145 § 8.7.)

---

[3] A "Participant" is someone actively employed by Cimarex on the date of the Change in Control. (*Id.* § 3.1.) It is undisputed that Bessinger was a Participant.

[4] The "Company" refers to Cimarex "and any successor to such entity." (AR 134 art. II(i).) To avoid confusion, the Court will refer to the Company as "Cimarex" both before and after the merger.

### B.   The Change in Control and Bessinger's Termination

The parties agree that Cimarex merged with Cabot Oil & Gas Corporation to form Coterra Energy, Inc. ("Coterra") on October 1, 2021. (Dkt. No. 41 at 1–2; Dkt. No. 42 at 4.) The parties also do not dispute that this merger qualified as a "Change in Control" under the Plan. (Dkt. No. 41 at 3; Dkt. No. 42 at 9.) The only dispute is whether Bessinger was eligible for separation benefits because either (a) Cimarex terminated his employment or (b) Bessinger terminated his own employment within 120 days of learning Cimarex was requiring him to relocate his principal place of business more than 50 miles from Tulsa, Oklahoma.

Relevant to Bessinger's arguments, before the change in control, on September 14, 2021, another lead accountant, Jonathan Warstler, inquired with Regional HR Manager Sarah Phelps about a release date because he had "another opportunity." (AR 11; *see also* AR 14 (noting Phelps' position).) By September 21, Revenue Supervisor Ryan Daniel was announcing Warstler's new job and making process changes—but his manager, Brett Brown, said it was too early to discuss employment changes. (AR 12; *see also* AR 34 (noting Brown's position).) On September 24, 2021, Warstler e-mailed Daniel, stating that, back in May, he had been informed that the entire accounting department would be relocating to Houston if the merger went through. (AR 13.) Daniel responded: "It was my understanding that all back office positions including Tulsa Accounting would be relocated to Houston upon completion of the merger. They also stated that there would be transition employees for a time being in Tulsa until the job function(s) move to Houston." (*Id.*)

On September 28, 2021, Phelps e-mailed Tulsa accounting employees, asking them to update their preferences for relocating to Houston, as Cimarex was moving "through

3

organizational design and talent selection for" the new company. (AR 16.) Bessinger responded that he was unwilling to relocate, as did Warstler. (AR 15–16.)

On September 30, 2021, Brown drafted a personnel reduction proposal, described as "a staff reduction to Revenue Accounting instigated by the large property divestiture to Mach Resources which closed in June." (AR 17–18.) Brown stated that, because of the divestiture, two accounting groups for company-operated wells could be reduced by one headcount. (AR 18.) In the group that handled oil and contract gas, Samantha Hewitt's desk was most impacted, and she wanted to be let go as soon as reasonable. (*Id.*) In the group that handled spot market gas sales, Robert Kruse's desk was most impacted, but he wanted to stay with the company. (*Id.*) Warstler, however, was also in that group, and wanted to leave. (*Id.*) Brown felt that the team and the company could accommodate both Kruse and Warstler's wishes. (*Id.*) Brown performed a similar analysis of employees who worked on outside-operated wells. (*Id.*) Brown then proposed that Cimarex sever Hewitt, Warstler, and two others. (*Id.*)

On October 4, 2021, Warstler formally requested a release from the company along with full separation benefits. (AR 19.) Three days later, Brown received approval of his personnel reduction proposal. (AR 29.) On October 21, Brown stated he had communicated to the four employees, including Warstler, that they would be terminated in mid-November 2021. (*Id.*) Phelps then indicated she would follow up with the employees on "the process on severance." (AR 30.)

As of December 2021, Bessinger remained employed by Defendants in Tulsa. (AR 34.) Bessinger asserts he spoke to his managers on numerous occasions in December 2021 and February 2022 to discuss his plan to transition to a different company and receive severance benefits. (AR 85–86.)

On February 3, 2022, Bessinger e-mailed Phelps to request his "release as a transition employee with Coterra and Legacy Cimarex." (AR 67.) Phelps responded, "Have you discussed this with your Manager? This is not a decision that is mine to make, but driven by the business needs." (AR 68.) An hour later, Brown e-mailed his boss Justin Anderson, the Director of Operations Accounting. (AR 69; *see also* AR 32 (noting Anderson's position).) Brown's e-mail stated, "I got some unfortunate news today. Jay Bessinger has a job offer that he intends to leave for regardless of the severance. He needs to leave by March 4." (AR 69.) Fifteen minutes later, Bessinger reported to Phelps that he had talked to his manager who was aware of his release request. (AR 70.)

On March 3, 2022, Bessinger formally requested benefits under the Plan. (AR 81.) That same day, Brown memorialized Bessinger's verbal resignation, effective March 4, 2022. (AR 80.)

## C. Denial of Benefits and Appeal

### 1. The Initial Denial

On May 3, 2022, Cimarex denied Bessinger's request for benefits. (AR 82–84.) The letter stated that because Bessinger voluntarily resigned in order to take a job with another company, he did not qualify under either (a) or (b) of § 4.1 of the Plan. (AR 82.)

### 2. The Appeal

Bessinger appealed on May 25, 2022. (AR 85–87.) Bessinger first disputed the assertion that he requested severance benefits on March 3, 2022, asserting he had requested benefits through Brown and Anderson on "numerous occasions" prior to sending the letter. (AR 86.)

Besinger also asserted that Cimarex's reason for denying him benefits was unsound, because other coworkers had resigned to take new jobs but were awarded

5

benefits, and because the Plan did not "allow for denial based upon an employee accepting alternate employment." (*Id.*)

Bessinger then invoked § 4.1(b), the portion of the Plan allowing for benefits when a Participant terminates their own employment for "Good Reason," and argued this was triggered because "his entire accounting department would be relocated to Houston" and he "had to inform HR whether he was willing or unwilling to move . . . on September 28, 2021." (AR 86–87.) Bessinger argued he requested to receive severance benefits from his supervisors within 120 days of that date.[5] (AR 87.) Bessinger did not invoke § 4.1(a), which provides for benefits when the Company terminates the employee.

### 3. Denial on Appeal

On July 27, 2022, the Appeals Committee denied Bessinger's appeal. (AR 1–5.) The Committee's decision included many of the facts outlined above, but also added that (1) Cimarex announced the upcoming change in control to its employees in May 2021;[6] (2) Cimarex posted information regarding change-in-control benefits on the company's intranet in June 2021;[7] (3) employees who responded "willing to relocate" to Phelps' September 2021 e-mail were given new offers of employment; (4) employees, like Bessinger, who were unwilling to relocate "were informed their role would be a transition role that would be eliminated at some point in the future"; (5) in addition to the employees terminated/released in November 2021, another accounting employee was

---

[5] Bessinger repeatedly notes the timing of his demand for benefits in relation to the 120-day deadline. However, the 120-day deadline in the Plan relates to how soon a Participant must terminate their employment after learning of the Good Reason. (AR 136 § 4.1(b).)

[6] The written record contains a reference to a meeting in May 2021 relating to the planned merger. (*E.g.*, AR 13.)

[7] The FAQs are included in the administrative record. The only "new" facts are when the information was allegedly posted on the company's intranet.

6

terminated/released in December 2021; (6) in late 2021, all remaining Tulsa accounting employees were informed that they were needed to complete the transition of the accounting department to Houston and that they were expected to continue their employment through the first quarter of 2023; (7) on February 3, 2022, Brown told Bessinger that Cimarex could not release him and, if he quit, he would not be eligible for severance benefits under the Plan;[8] and (8) from the December 2021 termination to July 27, 2022, Cimarex did not terminate any accountants in Tulsa. (AR 1–2.) In the current litigation, Bessinger only disputes as "unsubstantiated" the assertion that he agreed to a "transition" role, or that he "was given a Q1 2023 termination date."[9] (Dkt. No. 41 at 8.)

The Committee then outlined its analysis. First, the Committee rejected Bessinger's assertion that he was treated differently than other employees. (AR 3.) The Committee determined that the other employees were terminated by Cimarex based on business needs and department workloads. (*Id.*) Bessinger, by contrast, was not terminated by Cimarex and, instead, terminated his own employment voluntarily. (*Id.*)

Second, the Committee rejected Bessinger's assertion that he was denied Plan benefits because he had secured another job, again finding he was denied benefits because he terminated his own employment. (*Id.*) In the process, the Committee asserted that Bessinger was aware—from the FAQs—that, in order to receive benefits, Cimarex had to

---

[8] The written record shows Bessinger and Brown talked on February 3, 2022, and that, following the talk, Brown reported that Bessinger intended to leave regardless of severance. (AR 67–70.) The exact words Brown used in his conversation with Bessinger, however, are not in the written record.

[9] Elsewhere, Bessinger says bullet points 2, 3, 6, 10, and 14 on AR 1–2 are not supported by the record. (Dkt. No. 41 at 7.) But Bessinger does not dispute their accuracy other than as it relates to the transition role or the 2023 employment expectation.

agree in advance to an early termination date.[10] (AR 4.) And the Committee characterized Bessinger as "a transition employee (meaning an employee whose job was being eliminated)" who had notice that the specified transition date was the first quarter of 2023. (*Id.*)

Third, the Committee rejected Bessinger's assertion that his self-termination was for "Good Reason," because neither "the Company nor any employer required Bessinger to relocate his principal place of business to another metropolitan area" and at "no time was Bessinger required to move to Houston." (AR 4–5.)

## II.  Analysis

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (citation modified). To protect such benefits, a participant or beneficiary may sue "to recover benefits due to him under the terms of his plan . . . ." 29 U.S.C. § 1132(a)(1)(B).

Bessinger has now filed such a suit, arguing the denial of his request for benefits was arbitrary and capricious, violated the terms of the Plan, and was based on post hoc justifications. (Dkt. No. 41.) In his briefing, Bessinger argues the Committee abused its discretion by applying standards outside of the Plan to deny benefits; determining Bessinger "was given a Q1 2023 termination date" without supporting evidence; and

---

[10] The parties do not argue that the FAQs modified the terms of the Plan. Generally, "ERISA plans cannot be modified by informal written agreements." *IHC Health Serv., Inc. v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, No. 2:17-CV-01327-JNP-BCW, 2018 WL 3756959, at *3 (D. Utah Aug. 8, 2018) (citing 29 U.S.C. § 1104). ERISA requires plans to be maintained by a written instrument that describes the procedures by which it can be amended. *Miller v. Coastal Corp.*, 978 F.2d 622, 624 (10th Cir. 1992) (quoting 29 U.S.C. § 1102(a)(1), (b)(3)). There "is no liability under ERISA for purported informal written modifications to an employee benefit plan." *Id.* at 624–25.

failing to find Good Reason for his self-termination. (*Id*. at 7–11.) Bessinger also argues that, if he was a "transition" employee, this means he was terminated for refusing to relocate. (*Id*. at 9.) Throughout, Bessinger argues the benefits decision was tainted by a conflict of interest that should be weighed as one of great importance. (*E.g.*, *id*. at 6.)

### A. Standard of Review

Where, as here, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the Court asks "whether the denial of benefits was arbitrary and capricious." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotations omitted). When making this decision, the Court looks only at the administrative record—that is "the materials compiled by the administrator in the course of making his decision." *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1201 (10th Cir. 2002). Similarly, the Court considers only those rationales specifically articulated by the company in denying a claim. *Spradley v. Owens-Ill. Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012).

The arbitrary and capricious standard is generally a deferential one that upholds the decision below "unless it is not grounded on *any* reasonable basis." *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1357 (10th Cir. 2009) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)). "The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end." *Kimber*, 196 F.3d at 1098 (citation modified).

The standard is not without meaning, however, as ERISA requires plan administrators to discharge their duties solely in the interests of the plan participants and beneficiaries and to provide a full and fair review of claim denials. *McMillan v. AT&T*

*Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705 (10th Cir. 2018) (citing 29 U.S.C. § 1104(a)(1); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008); and *Firestone*, 489 U.S. at 113)).[11] Indicia of arbitrary decisions "include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002). Conversely, a decision is not arbitrary and capricious when it results from a reasoned and principled process, is consistent with the plan administrator's prior interpretations, is reasonable from an external standpoint, and is consistent with the plan's purposes. *See D. K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 808 (2024).

Plaintiff argues the decision was unsupported by substantial evidence and the product of a conflict of interest. Plaintiff also appears to argue there was not a full and fair review, because he was not given the opportunity to challenge certain unsubstantiated facts on appeal.

### B. Substantial Evidence Supports the Determination That Bessinger Terminated His Employment Without Good Reason

Before filing this suit, Bessinger consistently argued to Cimarex that he qualified for separation benefits under section 4.1(b) of the Plan. That is, when "the Participant's employment is terminated . . . by the Participant for Good Reason within 120 days after the Participant has knowledge of the occurrence of a Good Reason," with Good Reason including "the Company . . . requiring the Participant to relocate his . . . principal place of business to another metropolitan area" more than 50 miles away. (AR 135–136, art. II(p)(iii) & § 4.1(b).) This argument was rejected by both the Plan Administrator and the

---

[11] Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

10

Appeals Committee. The Plan Administrator found Bessinger "voluntarily resigned in order to take a job with another company." (AR 82.) The Appeals Committee found that Bessinger's self-termination did not qualify as a "Good Reason" termination because he was not required to move to Houston. (AR 4–5.)

Bessinger argues the Appeals Committee ignored the undisputed facts that (1) the entire accounting department was closing and would (at some point) be relocated from Tulsa to Houston and (2) the accounting department employees were asked to state whether they were willing to relocate. (Dkt. No. 41 at 8–9.) This, he asserts, means that he was being required to relocate and that, therefore, "Good Reason" existed for his self-termination.

The Court finds there is substantial evidence supporting Cimarex's decision.

### 1. Substantial Evidence, Generally

"Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (citation modified). It "requires more than a scintilla but less than a preponderance." *Id.* (internal quotations omitted). Substantiality is based on the record as a whole, taking into account whatever in the record fairly detracts from its weight. *Caldwell*, 287 F.3d at 1282.

### 2. Plan Interpretation

Courts assess the administrator's decision "based on the language of the plan," and, as such, "the first step towards interpreting an ERISA plan" is to "scrutinize the plan documents as a whole and, if unambiguous, construe them as a matter of law." *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008) (internal quotations omitted). "In making this determination, we consider the common and ordinary meaning

as a reasonable person *in the position of the plan participant*, not the actual participant, would have understood the words to mean." *Id.* (internal quotations omitted). If "the plan provision is unambiguous, and the plan administrator's interpretation differs from the unambiguous meaning, then the plan administrator's interpretation is unreasonable, and the decision to deny benefits based on that interpretation is arbitrary and capricious." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007), *abrogated on other grounds by Glenn*, 554 U.S. 105. Meanwhile, a plan is ambiguous "where a plan provision is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term." *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007) (internal quotations omitted). If "a plan provision is ambiguous, and the plan administrator adopts one of two or more reasonable interpretations, then the plan administrator's decision to deny benefits based on that interpretation survives arbitrary and capricious review." *Flinders*, 491 F.3d at 1193.

### 3. Application to the Plan's Definition of "Good Reason"

In light of these considerations, the Court finds that the Plan is unambiguous in its definition of Good Reason as it relates to relocation. Under the Plan, Good Reason includes "the Company . . . requiring the Participant to relocate his . . . principal place of business to another metropolitan area" more than 50 miles away. (AR 135, art. II(p)(iii).) To "require" commonly means "to claim or ask for by right and authority," "to demand as necessary or essential," or "to impose a compulsion or command on" (to compel). *Require*, Merriam-Webster, https://www.merriam-webster.com/dictionary/require [https://perma.cc/GAW2-B7GV] (last visited Dec. 8, 2025). Here, the Plan is specific as

to <u>who</u> must require <u>whom</u> to do <u>what</u>.  The <u>Company</u> (Cimarex) must require the <u>Participant</u> (Bessinger) to <u>relocate</u>.

Cimarex's interpretation does not differ from this meaning.  Cimarex did not request, demand, command, compel, or otherwise tell Bessinger that he must relocate his principal place of business to Houston.  Cimarex asked Bessinger if he was willing to move to Houston, albeit with the common understanding that—eventually—there would be no more accounting jobs in Tulsa.  If Cimarex eliminated those Tulsa jobs within two years of the change in control, Bessinger would be entitled to the separation benefit under a different provision of the Plan.  (AR 136 § 4.1(a).)  The Appeals Committee applied the unambiguous terms of the Plan when it found Bessinger was not required to move his principal place of business before his self-termination.  (AR 5.)

Moreover, even if the Plan were ambiguous, Cimarex adopted a reasonable interpretation.  Bessinger argues he was being required to relocate to Houston because, if he did not, his job in Tulsa would (eventually) end.  The Appeals Committee rejected this reasoning because Bessinger was never required to move to Houston, was never offered to be relocated to Houston, and his "principal place of business remained Tulsa from the date of the change in control to the date of his voluntary termination."  (AR 5 & n.3.)

Let us assume that "requiring the Participant to relocate" is ambiguous and includes a scenario where the Company decides to move the office in which the Participant has been working and the Participant is—as Bessinger was here—unwilling to relocate. Then, there is an additional ambiguity as to timing.  Is an unwilling Participant "required" to relocate at the time the move is announced but before it begins?  Once the move is in progress?  Once it is complete?  Bessinger opts for the earliest time period—

13

once the move is announced.[12] By basing its decision on the fact that Bessinger's job was in Tulsa on the date he quit, Cimarex opted for the latter. This falls within the continuum of reasonableness, particularly where the Plan was enacted "to assure the Company . . . of the continued employment and attention and dedication to duty of their employees and to seek to ensure the availability of their continued service, notwithstanding the . . . occurrence of a Change in Control." (AR 131.) *Cf. Televantos v. Lyondell Chem. Worldwide*, 31 F. App'x 63, 65, 67–68 (3d Cir. 2002) (finding plan requiring "relocation of the Participant's principal place of work" to require "an actual change," not a future change, before the clause was triggered).

### 4. Bessinger's Plan-Related Arguments

Bessinger's arguments to the contrary are not persuasive.

#### a) Use of the Word "Transition"

In his brief, Bessinger argues that Cimarex's "so-called 'transition' designation was an arbitrary, bad-faith manipulation of the Plan . . . ." (Dkt. No. 41 at 7.) He also argues that the Appeals Committee abused its discretion by applying the terms "Transition Employee" and "Transition Date," which were not terms under the Plan. (*Id.* at 8; *see also* Dkt. No. 43 at 3.) He maintains that there is, in fact, no evidence he "agreed to any transition date or transition role at all." (Dkt. No. 41 at 8.)

---

[12] Bessinger does not explain how his interpretation would allow him to claim benefits under the 120-day requirement for self-termination. (AR 136 § 4.1(b).) That is, to be entitled to benefits, a Participant must self-terminate for Good Reason "within 120 days after the Participant has knowledge of the occurrence of a Good Reason." (*Id.*) Here Bessinger asserts he was required to relocate when Phelps asked Tulsa Accounting employees to update their relocation preferences on September 28, 2021. (Dkt. No. 41 at 9.) Bessinger announced his intention to resign on February 3, 2022 (AR 67) and officially resigned on March 4, 2022 (AR 80)—neither of which are within 120 days of September 28, 2021.

First, Bessinger is incorrect in asserting there is no evidence in the record that he agreed to a transition role. Bessinger referred to himself as a "transition employee" when he requested his release in February 2022. (AR 67.) On the other hand, Bessinger is correct in asserting that there is no basis in the written record for finding that employees like him were informed they would be needed as transition employees until the first quarter of 2023. He is also correct that both the company's FAQs and the Appeals Committee referred repeatedly to employees like Bessinger as "transition employees." (AR 1, 4, 156.)

What is missing, however, is a reasoned argument as to why this means Cimarex abused its discretion in denying Bessinger benefits. As the Appeals Committee explained, it considered the term "transition employee" to mean "an employee whose job was being eliminated" (AR 4), and the parties agree this is exactly what Bessinger was.[13] That is, the term is simply shorthand—or as Bessinger prefers, a "term of art" (Dkt. No. 41 at 11)—to refer to employees who were not required to move, whose jobs would eventually be eliminated, but whose jobs had not yet been eliminated.[14] It is irrelevant whether Bessinger knew that the company expected him to work until the first quarter of 2023; what is relevant is that Bessinger knew the company was still employing him at the time he chose to quit.

Under the unambiguous terms of the Plan, if Bessinger remained with Cimarex until it terminated him—and that termination occurred within two years of the October

---

[13] This also means that Cimarex did not ignore the fact that the functions of the Tulsa Accounting office were going to be moved to Houston, as Bessinger claims (Dkt. No. 41 at 8–9).

[14] The Appeals Committee also noted that Cimarex did not agree to terminate Bessinger at an earlier date (AR 4), something no party disputes.

2021 change in control—he would be entitled to separation benefits. (AR 136 § 4.1(a).) Until then, he was a transition employee—someone not required to move but not yet terminated (i.e., someone not yet entitled to separation benefits). This prospect of future termination was not a "Good Reason" allowing for an employee to choose an earlier date for self-termination and then receive benefits. (*See* AR 135 art. II(p); AR 136 § 4.1(b).)

### b) The Treatment of Other Employees

Bessinger also argues that Cimarex's denial was arbitrary and capricious because others in similar circumstances were awarded benefits under the Plan. Particularly, Bessinger highlights that Warstler and others informed Cimarex of their wish to "move on" and were awarded separation benefits. (Dkt. No. 41 at 9, 11.)

The Appeals Committee found that these employees were differently situated, because they were actually terminated by Cimarex. (AR 3.) There is substantial evidence in the record to support this conclusion. To be clear, the record also shows that Cimarex worked to accommodate both employees who wished to stay and those who wished to leave when deciding on staff reductions due to property divestures in September and October 2021. (AR 17–18, 29–30.) But the record supports the determination that these employees were terminated by Cimarex for business reasons that included a reduction in need. (AR 17–18.) There is no evidence in the record indicating that Bessinger had indicated a wish to leave before this decision was made or that his work had been similarly reduced when he first raised his plans to leave, whether in December 2021 or February 2022. As such, Cimarex's decision as to Bessinger was not rendered arbitrary by its treatment of other employees.

### c) Constructive Termination

At various times in this case, Bessinger appears to assert that Cimarex constructively terminated his employment, entitling him to separation benefits under section 4.1(a) of the Plan. (*See, e.g.*, Dkt. No. 41 at 4, 7, 9.) Bessinger does not explain how continuing to work (and getting paid) constitutes the "separation from service," necessary to trigger a termination under the Severance Plan.[15] The Court will not craft an argument for him. *See United States v. Nelson*, 801 F. App'x 652, 665 (10th Cir. 2020). There is substantial evidence supporting Cimarex's determination that Bessinger was not terminated by Cimarex before he submitted his resignation.

### C. A Full and Fair Administrative Review

In addition to his arguments regarding the interpretation and application of Plan's terms, Plaintiff also appears to argue that there was not a full and fair review of his request for benefits. A "full and fair" administrative review "means knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1300 (10th Cir. 2023) (internal quotations omitted); *see also Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1153 (10th Cir. 2009) ("Full and fair reviews must 'take[] into account all comments, documents, records, and other information submitted

---

[15] Section 4.1 requires that a Participant's employment be terminated "as a result of a 'separation from service' (as determined in accordance with Section 409A of the Code and the Internal Revenue Service and Treasury guidance thereunder) . . . ." (AR 136 § 4.1.) Separation from service generally means that the employer and employee reasonably anticipate that no further services will be performed, and an <u>involuntary</u> separation from service occurs when an employer exercises its unilateral authority to terminate an employee who is willing and able to continue performing services. *See Soto v. Disney Severance Pay Plan*, 26 F.4th 114, 118–19 (2d Cir. 2022) (citing 26 C.F.R. § 1-409A-1).

by the claimant'" (quoting 29 C.F.R. § 2560.503–1(h)(2)(iv).). An administrative review is appropriate when, as part of the appeals process, the company takes into account the information a claimant submits and reasonably explains why that information is sufficient or insufficient to support a claim. *Id.* at 1154.

Bessinger does not assert that Cimarex failed to consider information he submitted. Instead, Bessinger appears to argue that he was not given the opportunity to challenge whether he agreed to a "transition" role or "was given a Q1 2023 termination date." (Dkt. No. 41 at 8.) As noted above, the use of the word "transition" did nothing more than describe Bessinger's status at the time of his resignation—which was undisputed. As for whether Cimarex told Bessinger that they planned on him working through the first quarter of 2023, the Court has found that it does not affect the substance of the benefits decision.

Bessinger was given a full and fair administrative review of his claim.

### D. Cimarex's Conflict of Interest

The Court has also considered Bessinger's arguments regarding conflicts of interest in determining whether Cimarex acted arbitrarily in denying his request for benefits.

Where, as here, a plan administrator acts in a "dual role," because they both evaluate and pay claims, there is a conflict of interest. *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1232 (10th Cir. 2012). Other factors to consider when assessing conflicts include whether Cimarex appointed and compensated the plan administrator, whether the administrator's reviews or compensation were linked to the denial of benefits, and whether the provision of separation benefits had a significant economic impact on

Cimarex.[16] *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1175 (10th Cir. 2004). Here, it appears conceded that Cimarex appointed and compensated the plan administrator, and that the awards of separation benefits had some economic impact on the company.[17]

As noted above, a conflict of interest may be weighed as one factor in determining whether the administrator's actions constituted an abuse of discretion. *Foster*, 693 F.3d at 1232. In this assessment, a conflict is afforded "more or less weight depending on its seriousness." *Murphy*, 619 F.3d at 1157 & n.1. Conflicts "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision" and "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." *Glenn*, 554 U.S. at 117. Conducting an investigation and permitting appeals may minimize the importance of a conflict of interest to the analysis. *Foster*, 693 F.3d at 1232.

When other factors are closely balanced, a conflict of interest can be the tiebreaker. *Glenn*, 554 U.S. at 117. "That is, a conflict of interest affects the outcome at the margin, when we waver between affirmance and reversal." *Hancock*, 590 F.3d at 1155.

---

[16] Bessinger argues the Court is required to assume that all possible conflicts existed, because he was denied certain discovery. (Dkt. No. 41 at 6–7.) Bessinger provides no legal support for this argument. Instead, the Court found Bessinger failed to meet his burden of showing that all the extra-record discovery he requested was appropriate. (Dkt. No. 36). *See also Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir. 2010).

[17] Bessinger asserts that Coterra spent $42 million in separation benefits in 2023. (Dkt. No. 41 at 7; Dkt. No. 41-1 at 2.) But Bessinger does not place this amount in the context of the company's overall income or other expenses. (*See, e.g.*, Dkt. No. 41-1 (noting Coterra's 2023 net income was $1.625 billion).)

In the matter at hand, the Court is not wavering between affirmance and reversal. While there is some conflict inherent in this case, it is not enough for the Court to find that Cimarex abused its discretion in denying Bessinger separation benefits. There is substantial evidence supporting Cimarex's decision and very little supporting Bessinger's arguments of entitlement. Bessinger had an opportunity to appeal the initial decision, and he was provided with a more substantial analysis of his arguments following the Appeals Committee's investigation. While the Court has considered Defendants' conflict of interest, it does not tip the balance of factors in favor of finding that Defendants' actions were arbitrary and capricious, nor does it require the Court grant Bessinger's request for benefits. Bessinger's arguments are rejected.

## III. Conclusion

Having reviewed the parties' arguments and the administrative record, the Court finds Bessinger has not shown that Defendants' decision to deny him benefits under the Severance Plan was arbitrary and capricious.

IT IS THEREFORE ORDERED that the benefits decision under the Severance Plan is AFFIRMED. A separate judgment is entered herewith.

ORDERED this 8th day of December, 2025.

_____
SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT